At a Court of Oyer and Terminer held at this term, William A. Manluff, negro, was indicted for the crime of burglariously breaking and entering in the night time the dwelling house of Mrs. Hannah F. Jones, with intent to commit rape and murder. The indictment contained several counts alleging the burglarly to have been committed with the intent to murder one Lizzie Griffith, also one Charles Chance, also some person unknown to the grand jury, and also *Page 210 
with the intent to ravish the said Lizzie Griffith. The dwelling house of Mrs. Jones was in the city of Wilmington and was broke and entered by the prisoner between the hours of three and four o'clock A. M. on the twenty-ninth day of March preceding, by ascending a trellis at the rear of it to a window in the second story of the back building through which he effected his entrance into it, and by a passage leading from it to the bed room in which the woman named Lizzie Griffith, an irish servant girl, was then sleeping. On retiring to bed about eleven o'clock that night she closed her bed room door, but did not lock it, and was awakened about half-past three o'clock by the lighting of a match in her room, and saw by the light of it a colored man standing in the room. She was much frightened, but exclaimed "who is there and what brought you here!" The match was quickly extinguished by him, or went out. He made no reply to her inquiry, but came up to the side of her bed, and then said in a low voice "hush! hush! make no alarm!" and laying something cold like steel or metal on the side of her face, asked her if she could see his pistol, said he had a pistol and if she made any alarm, he would fire the contents of it into her body. She replied she would not, if he would leave the room. He then asked her why she had made an alarm, to which she answered that she could not help it. After the match went out it was so dark in the room she could not see whether it was a pistol or a knife he had in his hand. She then asked him several times to leave the room, to which he at length replied that he did not know the way out. She then told him that there was a candle in the room and to light it, which he did, and placed it on the bureau., and then came up to the side of her bed again, and enquired if a widow lady did not live there, to which she replied yes, and then, if there was any man in the house, to which she also replied yes, and then where he slept, she answered in the small building in the yard detached from the main building. He then said that he was the man he came to kill, and not her, that he did not *Page 211 
come after her, but to drive a bullet through that man's head. She asked him what that poor man had ever done to him that he should want to kill him. He said that it was none of her business. He had given him sass. He then asked if they had any colored men in the house, and she said no. And then, if she would know him were she to see him again, and she said "no, she could not tell one colored man from another." He then asked her, if she was afraid of him. She said no. He then said, "I didn't come after you, but that man, to leave him a dead man." He then laid his hand on her bed, which she pushed off, telling him she did not want his hand on her bed. He then asked her to kiss him, which she refused to do, and said she would scream and wake the house. He told her to scream, for he wanted to know how loud she could scream. He next asked her name, and where she was from, and how long she had been in the country. Before that he had asked her if she was prepared to die, and told her that if ever she made any complaint against him, or any stir about the matter, he would meet her again for it. He afterwards said to her she was a fine girl, when she told him she did not want him to tell her so, whether she was or not, and again ordered him to leave the room, or she would give the alarm instantly, to which he replied that he did not know the way out, when she told him he could take the candle; he then wanted her to light him out, but she said to him she would not get out of bed on any account. He next asked how he could get out, she told him to go out of the door, and where he could find the stairs; she was then sitting up in bed, and just as she took her eyes off him to look at the door, he struck her with something he had in his hand, but she could never see what it was, upon which she cried out murder, and on the second blow from him she fell back on her pillow and he ran out of the room. She soon afterwards rose from her bed and made her way in great fear and trepidation to the room of Mrs. Jones in the same story of the main building, with a great deal of blood on her face, neck and *Page 212 
the front of her clothing to her feet, and with her wounds still freely bleeding, and gave the alarm that a negro man had just left her room after insulting and cutting her in her bed, and that he was still in the house and in pursuit of her. Two physicians were immediately called in who described them as two incised wounds, one on the left temple and the other on the right side of the neck, clean cuts apparently made with a sharp knife or razor, but not deep, or penetrating much more than through the skin and the tissues below its surface, and which were soon healed. From her account the Mayor of the city prepared a description of the offender and advertised a reward for his apprehension, and in the course of a few days two colored men were in succession arrested by the police for the offense, and were brought before her for identification, but without hesitation she declared neither of them to be the man. On the arrest, however, a few days later, of the prisoner and his production before her, she as unhesitatingly identified him and pronounced him to be the offender, and which identification she now confirmed at the bar of the Court.
The prisoner proved that his character for peace and order had always been good, and that he had been out that night with a serenading party until one o'clock, when he returned to his home and went to bed.
David Paul Brown, for the prisoner. There were no less than ten counts in the indictment, and before the State proceeded to the jury he would ask the Court to require the Attorney General to elect and state on which one or more of them he would contend for a conviction in the case. Ros. Cr. Ev. 231, 232 and the cases there cited.
The Court, without hearing the Attorney General, declined to do so, and remarked that it was an application addressed to their discretion; and where there are several distinct and independent felonies charged in the *Page 213 
same indictment, the Court will require the Attorney General to elect on which of them he will rely for a conviction after all the testimony in the case has been heard on the trial of it; but such is not the case in this instance, for all the counts in this indictment are for the same alleged felony, the burglary alleged in each of them, and when such is the case it is now well settled both in England and in this country, and in this State also, that the Attorney General will not be required to make such election.
The case was fully and ably argued on the evidence before the jury by Higgins, Deputy, and Moore, Attorney General for the State, and by Mr. Brown for the prisoner.
Burglary may be defined to mean in law, the breaking and entering the dwelling house of another in the night time, with intent to commit some felony in the same, whether such felonious intent be executed or not. Murder, rape, arson, assaults with intent to kill, larceny, and many other offenses, known to our laws, are felonies; but it is not necessary for the purposes of this case, that I should particularly enumerate them.
There are several questions material to be considered by the jury. First — The breaking and entering the dwelling house of Mrs. Jones in the night time. Both breaking and entering are necessary to constitute the offense, and it must be in the night time; that is, it must be at a time, when there is not sufficient daylight or twilight begun or left, to discern the countenance of a person. But this does not extend to moon light.
Very slight breaking will be sufficient, as by forcing open a door, picking a lock, pulling back a bolt, breaking a window, taking out a pane of glass, lifting up the latch of a door, or the like; and, even the pulling down, or raising up, the sash of a window, amounts to a sufficient breaking, although the window has no fastenings, and is *Page 214 
only kept in its place by its own weight, or by reason of the pulley weights. And if, the outer door being open, the burglar enters through it and unlocks or unlatches a chamber door within the house, or if to escape he break his way out of the house, it is a sufficient breaking, in contemplation of law, to amount to a burglarious breaking into the house.
The question then, first to be considered by you, is, did the prisoner break and enter the dwelling house of Mrs. Jones in the night time? And here, it is proper to observe, that this question involves the question of the prisoner's identity. Because, before the jury can be justified in returning a verdict against him, they must be fully satisfied from the evidence, that he is the very man that broke and entered. It is seldom that the identity can be proved by direct testimony, and therefore, it is generally necessary to resort to circumstantial evidence; but in this case, the proof is both direct and circumstantial. Direct as regards the testimony of Miss Griffith, circumstantial as respects the foot prints and the clothing with the pocket book and its contents.
Lizzie Griffith swears positively to his identity. She described him accurately shortly after the occurrence, and before she had seen him after it, his color, his features, his size, his clothing, so accurately indeed, that the officer was led to arrest him from her description. She identifies his clothes and certain articles, found in his clothes, as her property; and which she swears, were left by her in the pocket of her dress, when she went to bed on the night of the alleged burglary. Moreover, the foot prints in the soft ground, near the trellis, seem to corroborate her. Is she mistaken in his identity, or does she knowingly swear falsely?
On the other hand you have the testimony of Campbell, the Howards, Wilson and his father, mother and brother, as to his whereabouts on that night.
Joshua Campbell. Saw the prisoner go out of the side gate and heard him at his father's door trying to get in, at a little after 1 o'clock — 10 minutes past 1. *Page 215 
 Geo. W. Howard. Left prisoner at 6th and French streets at 12 o'clock.
Francis Howard. Parted company with the prisoner at 11th and Market streets at 1 o'clock.
Isaac Wilson. Parted with him at 9th and Orange streets at a quarter to 1 o'clock.
John G. Manluff. I and William came home at 10 minutes to 1 o'clock.
Hester Ann Manluff. Between 10 minutes before and 10 minutes after 1 o'clock, and
Jno. G. Manluff Jr. 10 minutes past 1 o'clock.
If you shall be satisfied from the evidence that the prisoner raised the sash of the window over the trellis, and thus entered the dwelling-house of Mrs. Jones; or if, the sash being up, he entered through the window, and afterward unlatched the door of the chamber in which Lizzie Griffith slept; or if to escape he broke his way out of the house, then, we say to you that the breaking and entering, required by the law to constitute burglary, was complete.
If you shall be satisfied from the evidence that the prisoner broke and entered, then the next question to be considered, will be the intent with which he so broke and entered? Did he break and enter, with intent to kill and" murder Lizzie Griffith, or with intent to have carnal knowledge of her against her will and consent? Or did he break and enter with intent to kill and murder a person of the name of Charles Chance, or with intent to kill and: murder some other person whose name is unknown to you ? If he broke and entered for the purpose or with the intent of killing Chance or any other person, whether they were in the house at the time or not, the offense is complete. *Page 216 
The intent with which the deed was done, is a fact, to be proved, as any other fact in the case, either directly and positively, or circumstantially and inferentially, by the other facts established by the evidence. The intent of the accused is rarely declared by him in express words; you cannot look directly in his heart, and there read its secret purposes. You have no such power, and therefore, you are compelled to look to external circumstances, which have some relation to the fact charged, as indicating the internal purpose and intent of the heart. Circumstantial evidence, may be, and often is, as conclusive a:; direct testimony. The mode and manner of the breaking and entry, the time of night, his conduct when in the room his manner there, his conversation and threats, the nature of the weapon, dangerous or deadly, the nature of the wounds inflicted, these, and all other circumstances proved in the case are proper matters for your consideration, in determining the question of intent, because, the crime consists in breaking and entering for the purpose and with the intention of committing the felony, by killing the person supposed to be in the house, and whom he sought there.
As I have already stated to you, that the breaking and entering must be for a felonious purpose; the intent to commit the felony is an essential ingredient in the offense of burglary; without such intent it would be merely a trespass. But it is a well settled general rule of law, that a person who commits one sort of felony in attempting to commit another, cannot excuse himself, on the ground that he did not intend the commission of that particular offense.
In general, the intent may be presumed from what the accused actually does in the house after breaking and entering it; if he commits a felony, it may fairly be presumed that he broke and entered it for that purpose; and in this case, if the prisoner, when he cut the girl Lizzie Griffith on the neck and temple or face, intended to kill her, it may fairly be presumed, in the absence of proof to the *Page 217 
contrary, that he broke and entered the house for the purpose of killing her.
Evidence of the prisoner's good character is always admissible. In doubtful cases, as where there is great conflict of testimony on material and essential points, or where the evidence, for and against the accused, is pretty nearly balanced, former good character, if proved, is entitled to due weight, and should incline the scales in favor of the prisoner. But where the facts proved are such as to satisfy the minds of the jury of the guilt of the accused, character however excellent, is entitled to very little, if any, consideration or weight.
Gentlemen, the question which you are called upon to decide by your verdict, is, whether William A Manluff, the prisoner at the bar, is guilty in manner and form as be stands indicted, or nor guilty. This question you are to decide according to the evidence. If you are satisfied from the evidence that he is guilty, it is your duty to say so by your verdict. If after thoroughly examining the evidence, and maturely considering it, you entertain any reasonable doubt of his guilt, and by a reasonable doubt, I mean such a doubt as honest conscientious men, acting under the solemn obligation of their oaths, in full view of all the testimony, feel themselves constrained to entertain, the prisoner is entitled to the benefit of such doubt, and your verdict should be in his favor.
 Verdict — "Guilty."